# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| PERFECT BROW ART INC., *et al.* | Case No. 19-1811 |
| | (Joint Administration Requested) |
| Debtors.[1] | Honorable Donald R. Cassling |

## DECLARATION OF ELIZABETH PORIKOS-GORGEES
## IN SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS

I, Elizabeth Porikos-Gorgees ("*Gorgees*"), hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.  I am the sole shareholder and President of Perfect Brow Art, Inc, ("*Brow Art*"), Perfect Brow Florida, Inc. ("*PB Florida*"), Perfect Brow Puerto Rico, Inc. ("*PB Puerto Rico*"), Perfect Brow New York, Inc. ("*PB New York*"), Locks Rock, Inc. ("*Locks Rock*"), P.B. Art Franchise, Inc. ("*PB Franchise*"), Perfect Brow Oakland, Inc. ("*PB Oakland*") and Ooh La La Franchise Beauty Bar, Inc. ("*Beauty Bar*" and collectively with Brow Art, PB Florida, PB Puerto Rico, PB New York, Locks Rock, PB Franchise and PB Oakland, the "*Debtors*").

2.  I have been the sole managing member of each of the Debtors since their inception and I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.

---

[1] The debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal taxpayer-identification number, are: (i) Perfect Brow Art, Inc. (5731); (ii) Perfect Brow Florida, Inc (5602), (iii) Perfect Brow Puerto Rico, Inc. (3497), (iv) Perfect Brow New York, Inc. (2041), (v) Locks Rock, Inc. (5046), (vi) P.B. Art Franchise, Inc. (0026), (vii) Perfect Brow Oakland, Inc. (5727), and (viii) Ooh La La Franchise Beauty Bar, Inc. (0714).

3.      On the date hereof (the "*Petition Date*"), each of the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*").  In order to enable the Debtors to minimize the adverse effects of the chapter 11 filing, the Debtors are requesting various types of relief in "first day" motions and applications (collectively, the "*First Day Motions*") that are being filed with the Court.

4.      I am submitting this declaration (the "*Declaration*") in support of the Debtors' chapter 11 petitions and First Day Motions in the above-captioned cases.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my review of public and nonpublic documents, or my opinion, based on my experience and knowledge of the real estate industry and the Debtors' operations and financial condition.  If called upon to testify, I could and would testify competently to the statements set forth herein.

5.      Part I of this Declaration describes the Debtors' businesses and the circumstances surrounding the commencement of these chapter 11 cases.  In Part II of this Declaration, I substantiate the truth and accuracy of the relevant facts set forth in the First Day Motions filed concurrently herewith.

## I.     BACKGROUND

**A.     Debtors' Businesses**

6.      The Debtors were founded in 2006, are headquartered in Wilmette Illinois and operate 186 fully licensed eyebrow threading boutiques (the "*Stores*") throughout the United States. The Debtors pride themselves on offering a wide range of beauty and skin care services, with an emphasis on threading. The Debtors have both the technical expertise as well as the

experience to help their customers find the image they are looking for. The Debtors specialties include

- Eyebrow Threading
- Body Threading
- Makeup
- Facial Threading
- Henna Tattoos
- Skin Care

7. As of the Petition Date, the Debtors employed approximately 600 employees, including 580 threading professionals and another 20 employees focused on retail and corporate operations in the Debtors' Stores and corporate office. Approximately 450 employees work on a full-time basis while approximately 150 are part-time employees.

8. For the year ended December 31, 2018, the Debtors generated approximately $23.52 million of gross sales and royalties.

9. The Debtors operate approximately 141 of their Sores and franchisees operate the other 45 Stores. The Debtors' principal assists consist of franchise agreements and leases.

10. The Debtors do not have any secured creditors. The Debtors estimate aggregate unsecured debt of approximately $4.0 million as of the Petition Date. These obligations are generally owed to trade creditors and landlords with respect to the Debtors' Store locations and corporate office.

**B.    Reasons For Chapter 11 Filings**

11. All of the Stores are located in shopping malls. Foot traffic in shopping malls has declined dramatically over the last two or three years on account of the numerous retailers who are no longer in business and because more and more customers shop on line. While the Debtors believe that their future is bright as some shopping malls are converted into mixed use projects, in the interim this reduction in foot traffic has resulted in a significant decline in the Stores revenues. In addition, expenses have been increasing due to higher rents, increases to the

minimum wage, and state regulatory requirements requiring the Debtors to employ licensed cosmetologists (whom are paid significantly more than one who is not licensed). The Debtors lease each of their locations and, due to recent cash flow difficulties, they have fallen behind on their lease obligations.

12. The Chapter 11 Cases were thus filed to preserve the value of the Debtors' assets for all of their creditors, and to permit the Debtors to either sell their assets as a going concern or restructure their liabilities and reorganize their business in a comprehensive and orderly fashion.

## II. FIRST DAY MOTIONS AND APPLICATION

13. Concurrently with the filing of its Chapter 11 petition, the Debtors are filing certain applications, motions, and proposed orders. The Debtors request that the relief described below be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtors for the benefit of all parties in interest.

14. I have reviewed and discussed with Debtors' counsel each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference any factual statements set forth in the First Day Motions. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the goals of this Chapter 11 Case.

**A.    Motion to Direct Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>")**

15. By the Joint Administration Motion, the Debtors request that the Bankruptcy Court authorize and direct the joint administration of the chapter 11 cases of each of the Debtors and the consolidation thereof only for procedural purposes pursuant to Rule 1015 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*"). In addition, the Debtors request that

the Clerk of the Bankruptcy Court make an entry on the docket of Brow Art's case stating that an order has been entered directing joint administration of these chapter 11 cases and that all further pleadings and other papers shall be filed in and all further docket entries shall be made in the Brow Art docket.

16.  The Debtors are related entities and are filing petitions in the same Bankruptcy Court. I believe that joint administration will be less costly and burdensome than separate procedural administration of the estates due to the combined docket and combined notice to creditors and parties in interest.  Parties in interest will likely file many applications, motions, orders, hearings, and notices in these cases that will affect all Debtors and their estates.  Joint administration will keep all parties informed of matters related to these cases without the inconvenience and confusion of reviewing separate dockets.  In addition, since the Debtors are seeking only administrative consolidation by this motion, rather than substantive consolidation, I do not believe creditors' interests will be impacted.

17.  I believe that if each Debtor's case was administered independently, there would be a number of duplicative pleadings and overlapping service. This unnecessary duplication of identical documents would be wasteful of the Debtors' resources, as well as other parties' and this Bankruptcy Court's resources.

18.  Therefore, I believe that the chapter 11 cases should be jointly administered for procedural purposes only, and the Joint Administration Motion should be approved.

**B.     Debtors' Application for an Order, Pursuant to 28 U.S.C. § 156(c), Bankruptcy Rule 2002(f), and Local Rule 2002-1(f), Appointing Donlin, Recano & Company, Inc. as Claims and Noticing Agent, Nunc Pro Tunc to the Petition Date ("Claims and Noticing Agent Retention Application")**

19.  The Debtors request authority to retain Stretto, ("*Stretto*") as their Claims and Noticing Agent in accordance with the terms and provisions of the *Stretto Engagement*

5

*Agreement* attached as Exhibit B to the Claims and Noticing Agent Retention Application effective *nunc pro tunc* to the Petition Date.

20. Stretto's services will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these cases. The Debtors have over 400 creditors. In view of the number of anticipated claimants and parties requiring notice, the Debtors submit that the appointment of a claims and noticing agent is both necessary and in the best interests of both the Debtors' estates and their creditors. Appointment of Sretto will maximize efficiency and relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing a large number of claims.

**C. Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Pre-Petition Employee Obligations and (B) Maintain and Continue Employee Benefit Programs and Pay Related Administrative Obligations ("Wages and Benefits Motion")**

21. The Debtors request authority, but not direction, to (a) pay certain pre-petition employee wages, salaries, and accrued compensation, including reimbursable expenses and benefit obligations (collectively, the "Employee Wages and Benefits") and (b) continue certain employee benefit programs and pay related administrative obligations. As of the Petition Date, certain pre-petition obligations to the Debtors' employees may be due and owing.

48. The Debtors do not believe payments of Employee Wages and Benefits to any individual employee will exceed the $12,850 statutory cap. While the Debtors seek authority, but not direction, to make payments in the ordinary course pursuant to certain employee incentive programs during the pendency of these Chapter 11 Cases that are similar to amounts historically paid, the Debtors are not seeking authority to pay, pursuant to this Motion, any bonuses to "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.

6

49.     Many of the Debtors' employees (the "*Employees*") rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Employees may be exposed to significant financial difficulties and other distractions if the Debtors are not permitted to honor their obligations for Employee Wages and Benefits. Furthermore, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefit Programs, Employees may not receive appropriate coverage and, thus, may become obligated to pay certain health care and related expenses out of pocket.

50.     Failure to satisfy certain pre-petition obligations may jeopardize employee morale and loyalty at a time when Employee support is critical to the Debtors' business and efforts in these Chapter 11 Cases. Without the relief requested in the Wages and Benefits Motion, the Debtors' employees may seek alternative opportunities. The loss of valuable employees would deplete the Debtors' workforce, thereby hindering the Debtors' ability to meet customer demands and the operation of the Stores during chapter 11 process. Additionally, employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

I declare under penalty of perjury that the foregoing is true and correct.

Date: January 22, 2019

By: _____
Elizabeth Porikos-Gorgees
Sole Shareholder and President of each of the
Debtors